

**FILED**
**Mar 17, 2026**
**03:36 PM(CT)**
**TENNESSEE COURT OF**
**WORKERS' COMPENSATION**
**CLAIMS**



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
## IN THE COURT OF WORKERS' COMPENSATION CLAIMS
## AT JACKSON

| | | |
|---|---|---|
| **BARRY BRABOY,** | ) | **Docket No. 2023-07-5758** |
| **Employee,** | ) | |
| v. | ) | |
| **US FOODS, INC.,** | ) | **State File No. 17142-2023** |
| **Employer,** | ) | |
| and | ) | |
| **AMERICAN ZURICH INS. CO.,** | ) | **Judge Amber E. Luttrell** |
| **Carrier.** | ) | |

---

## COMPENSATION ORDER

---

The Court held a compensation hearing to determine whether Mr. Braboy sustained a compensable back injury, and if so, whether he is entitled to additional benefits under Tennessee Code Annotated section 50-6-242 (2025) or limited to increased benefits under section 50-6-207(B). For the reasons below, the Court holds Mr. Braboy sustained a compensable injury and meets the requirement of 50-6-242.

### History of Claim

Mr. Braboy worked as a truck driver for US Foods. On March 2, 2023, he sustained a back injury. He backed the trailer up to the loading dock, but it was "offset," which caused the trailer to sit over a foot higher than the dock. Mr. Braboy moved a pallet to create a ramp when he felt a sudden pain in his back. He stated, "I knew when I moved that pallet that something had happened." He described the pain as a "9 out of 10."

Mr. Braboy immediately reported the injury, and US Foods sent him to an urgent care clinic and then a company doctor who ordered an MRI. After the MRI, Mr. Braboy was referred to a neurosurgeon. Rather than offering a panel, US Foods sent him to Dr. Thomas Gruber.

1

Mr. Braboy saw Dr. Gruber and reported left lower extremity pain and weakness. Dr. Gruber reviewed the MRI film and EMG, noted L2-3 radiculopathy, and diagnosed a "badly degenerated disc at L2-3 with leftward disc herniation causing impingement on the nerve root at that level." He stated that this finding was responsible for Mr. Braboy's pain and recommended surgery.

Before authorizing surgery, US Foods sent a causation questionnaire to Dr. Gruber. He stated the L2-3 disc herniation was "more likely than not the result of his work injury." He noted the L2-3 herniation resulted from a distinct new injury and not from preexisting disease.

Dr. Gruber performed a lumbar fusion surgery. Mr. Braboy saw Dr. Gruber or his nurse practitioner for ten more months for follow-up symptoms of weakness in his left quad and knee. Dr. Gruber released Mr. Braboy at maximum medical improvement on August 8, 2024. He noted that Mr. Braboy "still had some sensation of instability in his left leg although his strength improved." He assigned a 13 percent impairment and assigned permanent restrictions of "no bending, lifting, twisting, pushing, or pulling." He also completed a Bureau certification form stating that Mr. Braboy was unable to return to his pre-injury occupation.

During treatment with Dr. Gruber, US Foods sent Mr. Braboy a letter stating they were unable to accommodate his restrictions and that he could apply for other roles within the company "for which you feel you may be qualified."

Seven months after he reached maximum medical improvement, US Foods sent Mr. Braboy for an employer evaluation with Dr. Sam Murrell regarding causation. Mr. Braboy reported ongoing back pain with left knee numbness. Dr. Murrell diagnosed lumbar postlaminectomy syndrome with lumbar fusion, disc degeneration and low back pain. He reviewed pre-injury records from Mr. Braboy's 2007 surgery for a L5-S1 disc protrusion and from 2018, when Mr. Braboy had an MRI and conservative treatment for back pain. Dr. Murrell concluded that Mr. Braboy had multilevel degenerative changes on pre- and post-injury MRIs and could not state that the work event was the primary cause of his injury.

*Lay testimony*

Mr. Braboy is 60 years old with a high school degree. He has not worked since the 2023 injury and is currently drawing social security disability. As for his work history, he testified that he worked as a truck driver for the last 37 years. He worked for US Foods for the last 19 years as a delivery and a utility driver. He had a set route

2

as a delivery driver but no set routes as a utility driver. Otherwise, the job duties were the same.

He drove a tractor/trailer, cranked dolly legs, lifted boxes weighing from 10 to 100 pounds, and loaded 500 to 1000 boxes per day on the trailer depending on the route. Once he arrived at a location, he used a two-wheel dolly to unload boxes from the trailer onto the loading docks.

Before US Foods, Mr. Braboy drove a truck for a wholesale pharmaceutical company for 18 years. In both jobs, Mr. Braboy was required to bend, twist, push/pull a pallet jack, and lift in addition to his driving duties.

Mr. Braboy testified US Foods terminated him due to his restrictions. It never offered him another position with the company, and he knew of no other position for which he was qualified that could accommodate his restrictions. After 19 years at US Foods, he had knowledge of the different positions. He also stated he was required to maintain a commercial driver's license, which required him to pass an annual physical, which he can no longer do.

On cross examination, US Foods' counsel questioned Mr. Braboy regarding his ability to perform another driving position at the company, "hauling doubles." He testified that he would not be able to perform a "hauling doubles" position, which requires the driver to use a 2,000-pound dolly to hook two trailers together, push and pull a converter dolly, bend, twist, and sit for long periods. Also, he stated he was never offered the position, and he did not believe it was available.

He testified to difficulty standing or sitting for long periods. He drove two hours and thirty minutes to get to court and had to stop three times to take breaks and walk around. He attempted to go to a store and had to sit after 15 minutes of standing/walking. Mr. Braboy testified that he misses work and had hoped to work until he reached retirement age. He stated that "truck driving is all I know."

Mr. Braboy has been unable to find other employment for which he is qualified that complies with his restrictions. He considered applying at a dollar store near his home but knew the job would require lifting in excess of his restrictions. He testified he has struggled at home since the injury. He is unable to perform physical chores or enjoy hobbies. He said the injury "altered [his] whole life. I could do anything and everything before that day."

Mr. Braboy testified to two prior back injuries. In 2007, he had an L5-S1 herniated disc and underwent surgery. After he recovered, he had no back pain. In

2018, he missed several weeks of work due to a "sore back" and swelling. Mr. Braboy's symptoms improved after he took medication and rested. He stated he had an MRI but did not require surgery and was able to return to work without restriction. Since 2018, he stated he has had "no back issues" at all.

Mrs. Braboy's testimony mirrored her husband's. She said he had "no problems" after the 2007 surgery. She stated that in 2018, Mr. Braboy was sore, but he had no further problems after a couple of weeks of rest.

She testified the 2023 work injury was different and his pain has not stopped. Mrs. Braboy's testimony was also consistent with her husband's regarding his difficulties around the house. She added that he uses a "grabber" to pick up items and had to purchase slip-on shoes to avoid bending over. He cannot sit or stand for long, but standing is worse. Mrs. Braboy testified that his personality has changed, and he has gained weight due to inactivity.

*Dr. Gruber's testimony*

Dr. Gruber testified regarding causation. He stated the L2-3 herniated disc was a "new and distinct injury," and the surgery he performed was "more than 50 percent" related to that injury. He based his opinion on the combination of Mr. Braboy's history and diagnostic studies.

Dr. Gruber reviewed the records and MRI films from 2007, 2018, 2023, and post-surgery in 2024. Regarding the 2007 injury, he explained that Mr. Braboy had discectomy surgery at L5-S1 in 2007, and he "did very well" after that surgery "with no significant impairing back pain." As for the 2018 treatment, Dr. Gruber testified that he reviewed and compared the 2018 and 2023 MRIs and said the pre-injury MRI showed "mild disc bulging at L2-3" versus the 2023 MRI, which showed "a large left herniated disc at L2-3 that was not seen on the 2018 images and "that correlated with his symptoms." In sum, he stated that after the March 2023 injury, "he had a new onset of back pain and left leg pain, which he did not have before."

Dr. Gruber testified he assigned a 13 percent rating under the sixth edition of the Guides. He utilized Table 17.4 in chapter 17 and stated that "Class II is the best description for his injury and surgery that was needed." He confirmed that Mr. Braboy had ongoing radiculopathy at maximum medical improvement and testified that the rating was more than fifty percent caused by Mr. Braboy's work injury considering all causes.

4

As for restrictions, "due to [Mr. Braboy's] ongoing chronic pain issues" from this injury, he permanently restricted him from bending, lifting over 40 pounds, twisting, pushing, and pulling. He should be allowed to be absent once every four months for appointments and be absent from work "three times per week for a one-day rest."

On cross-examination, Dr. Gruber testified that Dr. Murrell's findings did not change any of his opinions. He stated, "Dr. Murrell's report did not reveal any new information that I didn't already know, and I had already drawn my conclusions and my opinions."

Dr. Gruber agreed that both the 2018 and 2023 MRIs showed degenerative changes at L2-3. However, he emphasized that the herniation was not present in 2018.

He also agreed that the 2007 records showed Mr. Braboy had radiculopathy. But Dr. Gruber explained that the 2007 radiculopathy was different than the 2023 radiculopathy because in 2007, it was caused by the L5-S1 nerve, and in 2023 it was caused by the L2-3 nerve.

US Foods' counsel asked Dr. Gruber how he was "certain this one injury caused more than 50 percent of his injury" given [Mr. Braboy's] preexisting condition? Dr. Gruber responded that the age-related changes on the 2018 and 2023 MRIs were "very similar." However, he said "the difference is the big –the giant left sided disc herniation."

*Dr. Murrell's testimony*

Dr. Murrell testified regarding his review of Mr. Braboy's 2018 MRI versus 2023 MRI. He said the 2023 MRI showed "disc osteophyte complexes at both L2-3 and L3-4 with elements of overall stenosis." He did not see "significant progression" of the degenerative changes present on the 2018 MRI.

He acknowledged that Dr. Gruber identified a disc herniation at L2-3 in 2023 that was not present in 2018 and then stated, "I think there was a disc bulge or protrusion there. I think they were present on both of them." He added, "You know, the radiologist disagrees with both of us."

Dr. Murrell acknowledged that if Dr. Gruber saw a disc herniation, the surgery performed was not an unreasonable surgery and agreed that the fusion surgery created an anatomic change.

5

Dr. Murrell stated that when determining causation, the employee's history must be considered. However, he stated "that [Mr. Braboy's] findings on his MRI suggest multilevel involvement which were present prior to his current injury. Based upon that, it's difficult to say with medical certainty that [the] event on March 2, 2023, would be the cause greater than 50 percent for him to need surgery." He believed that was an "element of disc that was bulging at L2-3 beforehand, as well as L3-4."

Dr. Murrell did not offer a contrary impairment opinion. He stated, "I don't think the impairment rating is necessarily unreasonable that [Dr. Gruber] provided."

He believed that Mr. Braboy is likely to have difficulties with his back and to require future treatment. But, he stated he did not have the 2024 post-op MRI scan to determine if there was any residual pathology at that level. He disagreed, however, with Dr. Gruber's restrictions. He stated that based on his evaluation and Mr. Braboy's primary complaint of back pain, "it doesn't appear to be a reason why he could not attempt to return to work."

**Findings of Fact and Conclusions of Law**

Mr. Braboy must show by a preponderance of the evidence that he is entitled to the requested benefits. Tenn. Code Ann. § 50-6-239(c)(6) (2025).

As a threshold matter, the Court finds Mr. Braboy established a specific incident on March 2, 2023, with his uncontroverted testimony that he experienced immediate back pain moving a pallet. Tenn. Code Ann. § 50-6-102(12)(A). Significantly, the Court finds both Mr. and Mrs. Braboy were straightforward, credible witnesses at trial. They appeared calm, forthcoming, and honest. *Kelly v. Kelly,* 445 S.W.3d 685, 694-695 (Tenn. 2014) (discussing indicia of witness credibility).

Next, Mr. Braboy must establish that his back injury and need for treatment primarily arose out of his alleged work injury. *Id.* § 50-6-102(12). Further, causation must be proven to a "reasonable degree of medical certainty," which requires an expert medical opinion. *Id.* § 50-6-102(12)(C). The Court analyzed the competing opinions of Drs. Gruber and Murrell. When deciding which medical opinion to accept, the Court can consider the experts' qualifications, the circumstances of their examinations, the information available to them, and the importance attached to the information by other experts. *Orman v. Williams Sonoma, Inc.*, 803 S.W.2d 672, 676 (Tenn. 1991). Both physicians are board-certified neurosurgeons and well-qualified. This factor favors neither physician.

6

As to the circumstances of their examinations, Dr. Gruber was Mr. Braboy's authorized physician who treated him over the course of a year. He took a detailed history, ordered extensive testing, performed surgery, considered his prior injuries, ordered therapy and assigned restrictions. Dr. Murrell saw him once for an employer evaluation seven months after he reached maximum medical improvement. This factor favors Dr. Gruber.

As to the information available to them, Dr. Murrell testified regarding Mr. Braboy's preexisting findings on the 2007 MRI and acknowledged that as a treating doctor, he does not rely solely on the radiologist's report because he might see something the radiologist did not. Yet, he admitted he did not have the 2007 MRI film to review. He also answered questions regarding impairment and future treatment and "would've liked to have seen …current imaging" but acknowledged he did not have the 2024 post-operative MRI scan, which showed residual radiculopathy at L2-3.

On the other hand, Dr. Gruber had the benefit of reviewing all of Mr. Braboy's MRI films when forming his opinions as to causation, impairment, and future treatment/restrictions. This factor favors Dr. Gruber.

The differences in the doctors' opinions comes down to their interpretation of Mr. Braboy's pre- and post-injury MRIs. Dr. Murrell saw degenerative changes on both and believed there was little progression from the 2018 study to the 2023 study. In contrast, Dr. Gruber saw degenerative findings on both but identified a "giant left sided disc herniation" at L2-3 on the 2023 MRI that was impinging the nerve root, causing Mr. Braboy's symptoms. He said Mr. Braboy suffered a distinct new injury, and his testimony was unequivocal and compelling.

Overall, Dr. Gruber's testimony was more persuasive and consistent with Mr. Braboy's. Based on the totality of the evidence, the Court holds Mr. Braboy sustained a compensable back injury and retained a 13 percent impairment.

US Foods agreed that, if compensable, Mr. Braboy qualifies for his original award and increased benefits. Thus, the issue is whether he proved his case "extraordinary" under section 50-6-242(a)(1) and proved, by clear and convincing evidence, that limiting his award to increased benefits would be inequitable considering the totality of the circumstances. If so, he may be awarded benefits not to exceed 275 weeks "in lieu of" increased benefits.

However, additional requirements exist for eligibility, including: (1) that the impairment rating is 10% or higher, (2) that the authorized treating physician certifies that the employee "no longer has the ability to perform the employee's pre-injury occupation" due to "permanent restrictions on activity" caused by the work

accident, and (3) that Mr. Braboy is not earning greater than or equal to 70 percent of his pre-injury salary. *Id.*

US Foods argued that limiting Mr. Braboy to increased benefits is equitable based on Dr. Murrell's testimony that he has released patients back to work after the same surgery. However, Dr. Murrell's own testimony revealed that he did not know what future treatment Mr. Braboy might need or what permanent impairment he might have because he did not have the 2024 post-operative MRI studies to review. On cross examination, counsel questioned Mr. Braboy's efforts to find employment but offered no evidence of employment for which he is qualified and that complies with his restrictions.

Mr. Braboy spent his entire 37-year career working in one occupation – trucking – for two companies.  He has no other training and is under significant restrictions. He described in compelling detail how his work injury and restrictions adversely affect him and restrict his ability to perform the job he planned to do until retirement age. He has lost his income while several years away from retirement. The Court observed he was emotional when his wife testified regarding the impact of this injury on his life.

For these reasons, the Court finds this is an "extraordinary case" under 50-6-242(a)(2) and finds by clear and convincing evidence that limiting Mr. Braboy's recovery to the benefits provided by 50-6-207(3)(B) would be inequitable in light of the totality of the circumstances.

Further, Mr. Braboy satisfied the requirements under 50-6-242(2)(A-C). He retained a 13 percent impairment from the injury, which exceeds the 10 percent requirement; Dr. Gruber signed the relevant form to certify that Mr. Braboy cannot return to his pre-injury occupation because of his permanent restrictions and testified that he maintains that opinion; and the parties agreed that Mr. Braboy is not earning greater than or equal to 70 percent of his pre-injury salary. He has not worked since US Foods terminated him, so he has no salary.

Because Mr. Braboy satisfied the above requirements, US Foods must prove by "contrary clear and convincing evidence" that he is "capable of performing his pre-injury occupation." *Batey v. Deliver This, Inc.* 568 S.W.3d 91, at 98 (Tenn. 2019). It offered no such evidence. Rather, the proof showed US Foods was unable to accommodate Mr. Braboy's restrictions and did not offer him another position in his pre-injury occupation within his restrictions. Mr. Braboy testified, credibly, that he could not find any position for which he was qualified that could accommodate his restrictions.

8

For these reasons, the Court awards Mr. Braboy extraordinary relief of $306,190.50, or 275 weeks of benefits at the compensation rate of $1,113.42 per week.

Mr. Braboy sought discretionary costs under Rule 54 of the Tennessee Rules of Civil Procedure. Specifically, counsel requested $1500.00 for Dr. Gruber's deposition; $907.32 for the court reporter for Dr. Gruber's deposition; $242.50 for the court reporter fee for Mr. Braboy's deposition; and $313.35 for the court reporter fee for the compensation hearing.

Rule 54.04(2) provides recovery for reasonable and necessary "court reporter expenses for depositions" and "expert witness fees for depositions." *Garassino v. W. Express, Inc.*, No. M2016-02431-SC-R3-WC, 2018 Tenn. LEXIS 60, at *8-9 (Tenn. Workers' Comp. Panel Feb. 8, 2018). Here, the Court finds Mr. Braboy's requested fees reasonable and necessary to prepare his case, except Dr. Gruber's $1500.00 fee, which exceeds the $750 limit under Tennessee Compilation Rules and Regulations 0800-02-16.01(1) for the first hour. According to Mr. Braboy's motion, the deposition did not exceed one hour. Thus, recovery for Dr. Gruber's fee is limited to $750, and US Foods shall pay discretionary costs of $2,213.17.

The parties agree as follows: (a) Employee is 60 years old; (b) according to mortality tables from the United States Centers for Disease Control and Prevention, Mr. Braboy's life expectancy is 23.9 years or 286.8 months; and (c) the trial award minus attorney's fees of $61,238.10 and costs of $1,114.91 constitutes a total lump-sum of $243,837.49 or an amortized monthly benefit of $850.20, representing the maximum monthly set-off for Social Security or other disability benefits under Tennessee Code Annotated section 50-6-207. Further, no representations or warranties were made to Mr. Braboy concerning the Social Security Administration's right to offset benefits received by him under this order or the Workers' Compensation Law.

**THEREFORE, IT IS ORDERED as follows**:

1. US Foods shall pay Mr. Braboy extraordinary relief of $306,190.50 or 275 weeks at the rate of $1,113.42. His attorney is entitled to a fee of 20 percent of this award or $61,238.10.

2. US Foods shall pay reasonable and necessary future medical expenses for the injury under Tennessee Code Annotated section 50-6-204.

3. US Foods shall pay discretionary costs of $2,213.17.

9

4. US Foods shall pay the $150.00 filing fee to the Clerk within five business days after the order becomes final.

5. US Foods shall file Form SD-2 with the Clerk within 10 business days of this order becoming final.

6. Finally, an employer might be penalized for several reasons, including failure to provide a panel of physicians under Tennessee Code Annotated 50-6-118(9) (2025). The uncontroverted proof showed that US Foods authorized treatment for Mr. Braboy's injury, but it never offered him a panel of physicians under section 50-6-204 to select his treating physician. Thus, US Foods and its carrier are referred to the Compliance Program for investigation and consideration of potential penalties.

**IT IS ORDERED.**

**ENTERED March 17, 2026.**

_Amber E. Luttrell_

**JUDGE AMBER E. LUTTRELL**
**Court of Workers' Compensation Claims**

**Appendix**

**Exhibits:**

1. Dr. Gruber's deposition
2. Medical records index
3. First Report of Injury
4. Wage Statement
5. US Foods' letter to Mr. Brayboy
6. Dr. Murrell's records
7. Dr. Murrell's deposition

## CERTIFICATE OF SERVICE

I certify that a copy of this Order was sent as indicated on March 17, 2026.

| Name | Email | Service sent to: |
|---|---|---|
| Peter Frech, Employee's Attorney | X | pfrech@forthepeople.com |
| Lauren Poole, Employer's Attorney | X | lmpoole@mijs.com |

_____

**Penny Shrum, Court Clerk**
Court of Workers' Compensation Claims

11



<u>Right to Appeal:</u>

If you disagree with the Court's Order, you may appeal to the Workers' Compensation Appeals Board.  To do so, you must:

1. Complete the enclosed form entitled "Notice of Appeal" and file it with the Clerk of the Court of Workers' Compensation Claims before the expiration of the deadline.
    ➢ If the order being appealed is "expedited" (also called "interlocutory"), or if the order does not dispose of the case in its entirety, the notice of appeal *must* be filed *within seven (7) business days* of the date the order was filed.
    ➢ If the order being appealed is a "Compensation Order," or if it resolves all issues in the case, the notice of appeal *must* be filed *within thirty (30) calendar days* of the date the Compensation Order was filed.
   When filing the Notice of Appeal, you must serve a copy on the opposing party (or attorney, if represented).

2. You must pay, via check, money order, or credit card, a **$75.00 filing fee** *within ten calendar days* after filing the Notice of Appeal.  Payments can be made in-person at any Bureau office or by U.S. mail, hand-delivery, or other delivery service.  In the alternative, you may file an Affidavit of Indigency (form available on the Bureau's website or any Bureau office) seeking a waiver of the filing fee.  You must file the fully-completed Affidavit of Indigency *within ten calendar days* of filing the Notice of Appeal.  **Failure to timely pay the filing fee or file the Affidavit of Indigency will result in dismissal of your appeal.**

3. You are responsible for ensuring a complete record is presented on appeal.  If no court reporter was present at the hearing, you may request from the Court Clerk the audio recording of the hearing for a $25.00 fee.  If you choose to submit a transcript as part of your appeal, which the Appeals Board has emphasized is important for a meaningful review of the case, a licensed court reporter must prepare the transcript, and you must file it with the Court Clerk.  The Court Clerk will prepare the record for submission to the Appeals Board, and you will receive notice once it has been submitted.  For deadlines related to the filing of transcripts, statements of the evidence, and briefs on appeal, see the applicable rules on the Bureau's website at https://www.tn.gov/wcappealsboard. (Click the "Read Rules" button.)

4. After the Workers' Compensation Judge approves the record and the Court Clerk transmits it to the Appeals Board, a docketing notice will be sent to the parties.

   **If neither party timely files an appeal with the Appeals Board, the Court Order becomes enforceable.  See Tenn. Code Ann. § 50-6-239(d)(3) (expedited/interlocutory orders) and Tenn. Code Ann. § 50-6-239(c)(7) (compensation orders).**

*For self-represented litigants: Help from an Ombudsman is available at 800-332-2667.*



## NOTICE OF APPEAL

Tennessee Bureau of Workers' Compensation
www.tn.gov/workforce/injuries-at-work/
wc.courtclerk@tn.gov | 1-800-332-2667

**Docket No.:** _____

**State File No.:** _____

**Date of Injury:** _____

_____

**Employee**

v.

_____

**Employer**

Notice is given that _____

*[List name(s) of all appealing party(ies).  Use separate sheet if necessary.]*

appeals the following order(s) of the Tennessee Court of Workers' Compensation Claims to the Workers' Compensation Appeals Board (check one or more applicable boxes and include the date file-stamped on the first page of the order(s) being appealed):

☐ Expedited Hearing Order filed on _____     ☐ Motion Order filed on _____

☐ Compensation Order filed on_____     ☐ Other Order filed on_____

issued by Judge _____.

### Statement of the Issues on Appeal

Provide a short and plain statement of the issues on appeal or basis for relief on appeal:

_____

_____

_____

_____

### Parties

**Appellant(s)** (Requesting Party): _____ ☐Employer ☐Employee

Address: _____ Phone: _____

Email: _____

Attorney's Name: _____ BPR#: _____

Attorney's Email: _____ Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellant \**

Employee Name: _____ Docket No.: _____ Date of Inj.: _____

**Appellee(s)** (Opposing Party): _____ ☐Employer ☐Employee

Appellee's Address: _____ Phone: _____

Email: _____

Attorney's Name: _____ BPR#: _____

Attorney's Email: _____ Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellee \**

### CERTIFICATE OF SERVICE

I, _____, certify that I have forwarded a true and exact copy of this Notice of Appeal by First Class mail, postage prepaid, or in any manner as described in Tennessee Compilation Rules & Regulations, Chapter 0800-02-21, to all parties and/or their attorneys in this case on this the _____ day of _____, 20 _____.

_____

*[Signature of appellant or attorney for appellant]*



**Tennessee Bureau of Workers' Compensation**
**220 French Landing Drive, I-B**
**Nashville, TN 37243-1002**
**800-332-2667**

### AFFIDAVIT OF INDIGENCY

I, _____, having been duly sworn according to law, make oath that because of my poverty, I am unable to bear the costs of this appeal and request that the filing fee to appeal be waived.  The following facts support my poverty.

1. Full Name:_____    2. Address: _____

3. Telephone Number: _____    4. Date of Birth: _____

5. Names and Ages of All Dependents:

_____ Relationship: _____

_____ Relationship: _____

_____ Relationship: _____

_____ Relationship: _____

6. I am employed by: _____

    My employer's address is: _____

    My employer's phone number is: _____

7. My present monthly household income, after federal income and social security taxes are deducted, is:

$ _____

8. I receive or expect to receive money from the following sources:

| | | | | |
|---|---|---|---|---|
| AFDC | $ _____ | per month | beginning | _____ |
| SSI | $ _____ | per month | beginning | _____ |
| Retirement | $ _____ | per month | beginning | _____ |
| Disability | $ _____ | per month | beginning | _____ |
| Unemployment | $ _____ | per month | beginning | _____ |
| Worker's Comp. | $ _____ | per month | beginning | _____ |
| Other | $ _____ | per month | beginning | _____ |

LB-1108 (REV 11/15)                                                                 RDA 11082

9. My expenses are:

Rent/House Payment $ _____ per month     Medical/Dental $ _____ per month

| | | | |
|---|---|---|---|
| Groceries | $ _____ per month | Telephone | $ _____ per month |
| Electricity | $ _____ per month | School Supplies | $ _____ per month |
| Water | $ _____ per month | Clothing | $ _____ per month |
| Gas | $ _____ per month | Child Care | $ _____ per month |
| Transportation | $ _____ per month | Child Support | $ _____ per month |
| Car | $ _____ per month | | |
| Other | $ _____ per month (describe: _____ ) | | |

10. Assets:

| | | | |
|---|---|---|---|
| Automobile | $ _____ | (FMV) | _____ |
| Checking/Savings Acct. | $ _____ | | |
| House | $ _____ | (FMV) | _____ |
| Other | $ _____ | Describe: | _____ |

11. My debts are:

| Amount Owed | To Whom |
|---|---|
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |

**I hereby declare under the penalty of perjury that the foregoing answers are true, correct, and complete and that I am financially unable to pay the costs of this appeal.**

_____

APPELLANT

Sworn and subscribed before me, a notary public, this

_____ day of _____, 20_____.

_____

NOTARY PUBLIC

My Commission Expires:_____

LB-1108 (REV 11/15)                                                    RDA 11082